IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2019 Session

## STATE OF TENNESSEE v. RAFFAEL FANSANO

**Appeal from the Circuit Court for Sullivan County**
**No. S65,438     William K. Rogers, Judge**

---

### No. E2018-00664-CCA-R9-CD

---

The Defendant, Raffael Fansano, was indicted for aggravated rape.  The Defendant filed a motion to suppress his confession, arguing, among other things, that he did not knowingly and voluntarily waive his Miranda[1] rights due to his intellectual disability.  The trial court granted the Defendant's motion to suppress, and the State sought and was granted an interlocutory appeal of the trial court's decision.  On appeal, the State contends that the Defendant was not in custody when he made the statement at the police department and, alternatively, that the trial court erred when it determined that the Defendant did not knowingly and voluntarily waive his Miranda rights.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Julie R. Canter, Assistant District Attorney, for the appellant, State of Tennessee.

Andrew J. Gibbons (on appeal and at hearing), District Public Defender; and Lesley A. Tiller (on appeal), Assistant District Public Defender, for the appellee, Raffael Fansano.

### OPINION
FACTUAL BACKGROUND

The Sullivan County Grand Jury indicted the Defendant for one count of aggravated rape, see Tennessee Code Annotated section 39-13-502, which was alleged to

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966)

have occurred on August 6, 2015, in a wooded area of Domtar Park in Kingsport, Tennessee. The victim reported being raped with a stick. Upon investigation, officers noticed that the Defendant was wearing clothing covered in mud. Following initial questioning at the scene, Kingsport Police Department (KPD) Sergeant Randy Murray asked the Defendant to accompany him to the KPD for further questioning. Because the Defendant had ridden a bicycle to the park, Sergeant Murray transported the Defendant to the police station in an unmarked police car. At the police station, Sergeant Murray advised the Defendant of his Miranda rights, and the Defendant executed a written waiver of his rights. During the interview, the Defendant confessed to sexually assaulting the victim with a stick.

After indictment, the trial court ordered the Defendant to undergo a competency evaluation. On November 20, 2015, evaluators with Frontier Health Assessment and Forensic Services determined that the Defendant suffered from an "Intellectual Disability (Mental Retardation)." The evaluators concluded that the Defendant was not competent to stand trial because he lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." Nonetheless, the evaluators believed that the Defendant could "possibly become competent to stand trial with further training." In addition, the evaluators found that, despite the Defendant's intellectual disability, he "was still able to appreciate the nature or wrongfulness of" his actions and did not suffer from diminished capacity at the time of the offense.

The Defendant underwent competency training at Greene Valley Developmental Center. During the Defendant's initial assessment on February 18, 2016, it was noted that the Defendant was "a legally competent adult" and did not have a "conservator acting on his behalf." The Defendant was administered the standardized test, "Competence Assessment for Standing Trial for Defendant with Mental Retardation (CAST-MR)," and his total score on the test was 82%. Moreover, the evaluators noted that the Defendant "scored [four] points above the mean score . . . for individuals with intellectual disabilities who were competent to stand trial." The "Competency Assessment Instrument (CAI)" was also administered to the Defendant on February 18, 2016. From this assessment, the evaluators surmised the following:

> [The Defendant] demonstrated a rational understanding of the charges against him. He noted that the charges are serious and others might regard him with fear if convicted of the charges. [The Defendant] knows the possible penalty of being found guilty. He was able to articulate a clear and plausible plan for his defense. He knew the possible pleas. He understood that a plea bargain involves pleading guilty to a lesser crime to reduce the

penalty and stated that if a person is guilty, it could be a good idea. He knew the roles of the courtroom personnel.

[The Defendant] did not know the difference between a felony and a misdemeanor upon initial assessment. He did not have understanding of his rights. These results indicated that training could benefit [the Defendant.]

Competency training was conducted on February 18, 2016, and February 25, 2016. Regarding the Defendant's training sessions, the evaluators detailed as follows:

[The Defendant] does not have a driver's license and was brought to training sessions by his [s]tep-father . . . . [The Defendant] conducted himself in an appropriate and respectful manner during each session. He was prompt to appointments and effort was considered good. [The Defendant's] affect was somewhat flat, but he was articulate in responses after thoughtful consideration. There are no concerns regarding appropriate behavior during courtroom appearances. [The Defendant] reported that in stressful situations, he tends to shut down or become quiet. During his account of the day he was arrested, [the Defendant] disclosed that he felt scared and intimidated when questioned. He stated that he did not know he could request an attorney and felt that he had to talk. He wanted to go home and was told that he could go after he admitted to his crime. [The Defendant] stated that he does not like conflict and will comply when it is demanded. The [e]xaminers spent a great deal of time reviewing his legal rights. [The Defendant] stated that he was not read his rights and that he was told he was not under arrest but that he had to go to the police station in the back of the cruiser to answer questions. He was not permitted to speak with his girlfriend, Kayla. Upon reaching the station, [the Defendant] eventually confessed to the crime in order to be let go. However, at that time, he was placed under arrest and sent to jail.

On March 3, 2016, the Defendant was re-administered the CAST-MR and the CAI. According to the evaluators, the Defendant's "knowledge of Basic Legal Concepts and Understanding Case Events as measured by the CAST-MR improved after training." The Defendant's total score on the CAST-MR was now 88%. After completing the follow-up assessment, the evaluators remarked, "[The Defendant] knows to request to speak with an attorney before making admissions or participating in questioning by authorities. He knows his attorney is on his side and that the [p]rosecutor is against him." "Based on [the Defendant's] interactions, responses during training and during follow-up assessment," the evaluators recommended that the Defendant be found competent to stand trial.

After being deemed competent to stand trial, the Defendant filed a motion to suppress "[c]ertain statements [that] were taken from [him] on August 6, 2015[,]" by Sergeant Murray. Specifically, the Defendant alleged the following: 1. "Under the totality of the circumstances test, the Defendant did not waive his rights under Miranda v. Arizona."; 2. "The statements are unlawful because they are involuntary."; 3. "The statements were obtained after the commencement of formal proceedings and the statements were taken in violation of the [D]efendant's right to counsel."; 4. "The statements are unlawful and therefore the evidence obtained as a result of said statements is also unlawful."; and 5. "The officer failed to fully advise the [D]efendant of his rights under Miranda v. Arizona." The State filed a response on the same day as the evidentiary hearing, arguing that the Defendant, considering the totality of the circumstances, had made a knowing and voluntary waiver of his Miranda rights. In support of its argument, the State noted the following:

> [A]t the time of police questioning, the [D]efendant displayed no signs of mental illness. The [D]efendant was coherent, not suffering from delusions, and agreed to speak with [Sergeant] Murray at the [KPD]. The setting in which the [D]efendant wrote his statement was not coercive or overreaching. Additionally, the [D]efendant completed High School in Gate City, Virginia and obtained a special education diploma.

On November 27, 2017, the trial court conducted an evidentiary hearing. At the outset of the hearing, defense counsel averred that the "burden [was] on the defense in this situation." After providing some background about the Defendant's mental health and the proceedings in this case, defense counsel argued that, based upon the Greene Valley report from the evaluators, the Defendant did not understand his Miranda rights or "the consequence of waiving those rights." The prosecutor made no opening argument "since the burden [was] on the Defendant."

The trial court noted that, previously, the Defendant "ha[d] been found to have intellectual disability. His Wechster intelligence scores [were] in the sealed record from his school.[2] The [D]efendant's psychological intelligence scores [were] 53 on the WISC III in 1995 and 48 in 1998."

Shannon Seaton, a senior psychological examiner for the Department of Intellectual and Developmental Disabilities, testified that the two evaluators who performed the Defendant's evaluation and competency training, Leslie Jones and Deborah Morrell, were no long employed by the agency. Their March 9, 2016 report was entered into evidence through Ms. Seaton.

---

[2] This sealed record is not included in the appellate record.

-4-

Ms. Seaton testified that the Defendant was assessed with standardized testing instruments to evaluate individuals with intellectual disabilities. She stated that the evaluation did not set forth or explain the Defendant's Miranda rights and that it was "not typically part of [the] evaluation" to explain those. She testified that the testing was given to assess "[t]heir ability to assist during a trial; the ability to know what the consequences are for their actions." Ms. Seaton further explained that subjects are asked questions such as: "Where were you? Who was there? Can you replay what they say you are accused of doing?" Ms. Seaton conceded that the Defendant's evaluation was approximately six months after he signed his statement to police and that she had no way of knowing whether he understood his rights when he signed the form. Ms. Seaton stated that investigating officers were not contacted to determine the Defendant's demeanor when the statement was taken.

KPD Sergeant Randy Murray testified that he received a call that a rape had occurred in Domtar Park on August 6, 2015. Upon arrival, Sergeant Murray spoke with several officers already on the scene and "learned that there were several different witnesses being interviewed." He recalled that he went to the "Netherland Inn side near the swinging bridge" to speak to the Defendant and that a couple of other officers had already briefly spoken to the Defendant. Sergeant Murray observed that the Defendant had "a lot of dirt and debris" on his clothing, including "watery mud" on his "right knee area." Sergeant Murray said that the Defendant's clothing was "a red flag" because the assault took place in a "wooded area" of the park that was "muddy and damp." When Sergeant Murray asked the Defendant "what he was doing at the park," the Defendant told Sergeant Murray that he had "just crossed over the swinging bridge and pointed down to the left, that he'd gone that direction[,]" specifically "ma[king] mention that he didn't go to the right." Sergeant Murray believed it was suspicious that the Defendant noted that he did not go to the right, which was the direction of the alleged assault. Sergeant Murray described that the Defendant was calm and coherent during their encounter at the park.

Sergeant Murray took the initial written statement at the park from the Defendant at approximately 5:00 p.m. while they "talked at the back of [Sergeant Murray's] car[.]" According to Sergeant Murray, other officers were present, but "they stood off to the side at some distance." Sergeant Murray also obtained a DNA sample from the Defendant and took possession of his clothing at the park. According to Sergeant Murray, the Defendant consented to giving a DNA sample, and a buccal swab was taken from inside the Defendant's cheek. Sergeant Murray testified that the Defendant was not under arrest at the park and was free to leave; however, "his clothes had to stay" because Sergeant Murray was concerned about potential DNA evidence that might be on the Defendant's clothes. The Defendant was allowed to call his girlfriend to bring a change of clothes for

him to the park. However, had the Defendant not cooperated, Sergeant Murray stated that he "doubt[ed]" that he would have let the Defendant leave the park with his clothes.

After the Defendant changed clothes, Sergeant Murray "wanted to continue the investigation," so he asked the Defendant if he would accompany him to the KPD. The Defendant agreed. Because the Defendant had ridden to the park on a bicycle, Sergeant Murray drove the Defendant to the KPD in his unmarked police car. Sergeant Murray testified that he was "pretty sure" that the Defendant rode in the front seat of his vehicle, although the Defendant told the evaluators that he rode in the back seat.

Sergeant Murray recalled that, once at the police department, he read and explained the Miranda rights to the Defendant, which the Defendant appeared to understand, and that the Defendant signed the waiver form at 7:40 p.m. However, Sergeant Murray claimed that the Defendant was not under arrest and was free to leave, despite his completing the Miranda form. The statement reflected that the Defendant was twenty-six years old at the time. The Defendant signed the admonition "Raffael Fansno." According to Sergeant Murray, after the Defendant was asked if he understood his rights, the Defendant answered affirmatively and did not ask any more questions. Sergeant Murray conceded that, when a suspect states that they understand their rights and sign the waiver, he does not conduct any further inquiry about their level of understanding. Sergeant Murray affirmed that it was this "second statement [at the KPD] that [was] the subject of the suppression motion."

Sergeant Murray interviewed the Defendant in an interview room set up in the back of the Criminal Investigations Division. According to Sergeant Murray, the interview room had windows that could be used for others to observe the interview but had no windows to the outside of the building. Sergeant Murray was "not sure" if there was an officer stationed outside of the interview room door. Sergeant Murray described that it "was a very laid-back interview" with just him and the Defendant in the interview room for "the most part." The Defendant was neither handcuffed nor threatened, according to Sergeant Murray. Also, the door was located between Sergeant Murray and the Defendant. Sergeant Murray averred that the Defendant "was very much engaged in the dialogue" and that he understood the seriousness of the allegations.

Sergeant Murray recalled that he focused on the seriousness of the sexual assault and "reiterate[d] over and over the fact that [the Defendant] was at the park," that he had dirt on his clothing," and that he was "very specific about not going to another . . . part of the park where" the assault took place. Sergeant Murray said that he continued to reiterate to the Defendant that the victim "was sexually assaulted and she was hurt, and that [they] need[ed] to get the truth." After reviewing those details "a couple of times," the Defendant "started to cry and bec[a]me very emotional." According to Sergeant

Murray, "[i]t wasn't until the confession came out that [the Defendant] start[ed] showing signs of being emotional and apologetic."

Sergeant Murray confirmed that this second statement was in his handwriting, not the Defendant's. Sergeant Murray read into the record the statement he took from the Defendant at the KPD on August 6, 2015:

> I want to say I am sorry, that I am sorry to her. I saw the girl first before the trip to the sand bar. She was across the bridge over from the Netherland Inn side and I had crossed over with my bike. I pushed my bike up next to her and we talked. We walked away from the sand bar and went passed the swinging bridge. I asked her how her day went. She said, "having a good" and I told her I was having an okay day. I did not tell her about my break up. We were together just a short time. I think I blacked out it was not me. I do not believe in hurting girls. I hit her, I think with my forearm she went down to the ground. She had on a black shirt, she was white, 20's to 30's not sure, she had on pants not sure blue jeans maybe, not sure her hair or shoes. I was upset feeling like a failure, I was upset over my relationship.
>
> I pulled on her pants, they came down and she was now face down. I saw the stick and picked it up. It was a part of a tree branch. It was a coin size around and less than a foot long. I put it inside her vagina. I pushed it in, pulled it out, and did this twice. I do not remember if she said or did anything to try to stop me. I knew I should not be doing what I did. I stopped when I started coming to myself. I am not sure if I touched her with my hands or fingers. When I stopped I had the stick in my hand. I think I dropped the stick. She was crying and I asked her if she was okay. Not sure if she said anything or not. I walked back pushing my bike across the bridge.

Moreover, Sergeant Murray testified that he read the Defendant's statement to him "several times." According to Sergeant Murray, the Defendant corrected Sergeant Murray when he wrote "sticks" instead of "stick," and the Defendant initialed the change.

Thereafter, Sergeant Murray learned that the victim did not speak with her attacker immediately prior to the rape. After relaying that information to the Defendant, the Defendant indicated he wanted to correct the details of his statement, relaying the following specifics as to how he encountered the victim:

> I want to change how I first spoke to her. I spoke to her on the Netherland Inn side near the swinging bridge. The conversation was what I

told[,] but I left. Later, maybe an hour I saw her. She was facing the river. I snuck up behind her, put my arms around her and that's when I hit her with my arm to get her on the ground. I want to say I am sorry for what I did. This is a true statement to the best of my knowledge.

Sergeant Murray interviewed the Defendant for approximately three hours. According to Sergeant Murray, the Defendant never indicated that he did not understand what Sergeant Murray was saying while Sergeant Murray was reading the statement aloud to the Defendant. Moreover, the Defendant did not appear delusional in Sergeant Murray's opinion. According to Sergeant Murray, the Defendant never displayed "any observable signs that he was incompetent [or] not aware of what was" taking place. Sergeant Murray said that the Defendant neither asked for a lawyer nor indicated that he wished questioning to cease.

Sergeant Murray agreed that this second written statement from the Defendant was "different" from what the Defendant had first told him at the park: "Well, on [the] scene he had [given] an initial statement about what he was down there to do. And then in [the interview] room he tells a different story about the rape." Sergeant Murray related that the Defendant was able to provide "a few" details identifying the victim, but the Defendant was "confused on whether or not" she was wearing "pants or blue jeans or shorts or whatnot." Sergeant Murray acknowledged that the Defendant's signature was "unusual," appearing "dyslexic." He further confirmed that the Defendant misspelled his own name on the admonition form. In contrast to his earlier testimony, Sergeant Murray opined that the Defendant was becoming emotional at the time he signed the <u>Miranda</u> waiver.

Furthermore, the statement was not recorded by audio or video, which was standard practice for the KPD according to Sergeant Murray. Sergeant Murray testified that, although he was aware that "other agencies in other counties" record interviews, interviews were not recorded in Sullivan County "at the request of the district attorney's office" and that he had "never heard anybody come up with a reason why [they] should change that policy."

The Defendant was placed under arrest after he gave his second statement. Sergeant Murray confirmed that he also collected, with the Defendant's consent, swabs of the Defendant's hands and fingers for possible DNA evidence.

Detective Daniel Horne with KPD testified that he walked into the interview room for a "fairly short" period of time when Sergeant Murray was interrogating the Defendant. According to Detective Horne, "the Defendant was visibly upset, crying, and was saying, 'I'm sorry.' Very apologetic." The Defendant repeatedly said that he was sorry for hurting the alleged victim and appeared to be remorseful for what he had done.

Detective Horne said that the Defendant seemed to know what was going on and where he was, and the Defendant's speech was coherent. Detective Horne did not see Sergeant Murray ever threaten the Defendant in any way. In addition, Detective Horne never heard the Defendant indicate he wanted to leave the interview room, request to stop talking, or ask for an attorney.

Detective Horne testified that he was "[b]riefly" there when Sergeant Murray questioned the Defendant at the park. Although Detective Horne recalled seeing Sergeant Murray place the Defendant in his police car, Detective Horne did not recall whether it was in the front or back seat.

That concluded the proof, and the parties argued the issues. Defense counsel argued that the Defendant's Miranda waiver was not knowing and voluntary, noting the Defendant's "mental deficiencies" and citing to findings from the evaluators' report. Defense counsel also remarked that "[t]here was no testimony given . . . that the consequences of waiving his rights were ever explained to [the Defendant]." In conclusion, defense counsel asserted that, "because of [the Defendant's] intellectual disability," he could neither "understand nor appreciate the significance of waiving his rights under Miranda," and defense counsel requested that the statement be suppressed.

The prosecutor replied by noting that Ms. Seaton testified that evaluators "don't talk to the police officers to ask what the defendant's behavior was like on that specific date, and [that] they don't have anything in their standardized test that is similar or even in line with Miranda." The prosecutor remarked that Sergeant Murray advised the Defendant of his Miranda rights and the consequences of waiving those rights, which "is it can be used against you in court." The prosecutor observed that Sergeant Murray "indicated, based on the observable signs that he saw, he thought the Defendant understood it." Furthermore, the prosecutor mentioned that Sergeant Murray testified that "[h]e read the statement several times to the Defendant" and that "[t]he Defendant was coherent enough" to make a correction to the statement. The prosecutor averred that there were no "objective signs" from the Defendant during the police interview "that he was not cooperating[,]" surmising that, under the "totality of the circumstances," the Defendant's Miranda waiver was knowingly and voluntarily made.

After the arguments of the parties, the trial court granted the Defendant's motion to suppress, concluding that the Defendant did not knowingly and voluntarily waive his Miranda rights. The State filed a timely motion seeking an interlocutory appeal, which the trial court granted based upon the need to prevent irreparable injury and the need to develop a uniform body of law. See Tenn. R. App. P. 9(a). In its application to this court, the State asserted that the victim did not see her attacker and that there was little evidence to establish the identity of her attacker without the Defendant's statement. The State also argued that the trial court did not make any factual findings concerning

-9-

whether the Defendant was subjected to a custodial interrogation and that the evidence presented at the evidentiary hearing suggested that the Defendant accompanied officers to the police station voluntarily. We concluded that the need to prevent irreparable harm to the State warranted granting interlocutory review. The case is now before us for review.

## ANALYSIS

On appeal, the State contends that the Defendant was not subjected to a custodial interrogation and that Miranda did not apply. Irrespective, the States submits that the trial court erred when it held that that Defendant did not knowingly and voluntarily waive his Miranda rights.

The Defendant responds that the State has waived the issue of whether the Defendant was in custody by failing to argue it in the trial court. Regardless, the Defendant maintains that the trial court made an implicit finding that the Defendant was in custody. Continuing, the Defendant avers that the trial court did not err when it ruled that the Defendant, who suffers from an intellectual disability, did not knowingly and voluntarily waive his Miranda rights. In the alternative, the Defendant alleges that, even if he was not in custody for purposes of Miranda, his statement was not voluntarily made.

Replying to the Defendant, the State argues that waiver does not apply to its argument that the Defendant was not in custody. According to the State, "[w]hether the [D]efendant was subjected to custodial interrogation was a threshold issue that had to be proven in order to show he did not voluntarily waive his Miranda rights." The State further submits that "[t]he [D]efendant's mental deficiencies are not relevant to the question of whether he was in custody, and the totality of the circumstances show he was not in custody." The States again submits that the trial court erred when it held that that Defendant did not knowingly and voluntarily waive his Miranda rights. Finally, the State maintains that the Defendant's confession was voluntary.

### I. *Standard of Review*

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id.

(citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)).

## II. *Fifth Amendment Jurisprudence*

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." See also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." "The significant difference between these two provisions is that the test of voluntariness for confessions under [a]rticle I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent conducts a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that a defendant was advised of his Fifth Amendment rights and that a defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

A person is "in custody" within the meaning of Miranda if there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quotation omitted). The Court has refused to extend the holding in Miranda to non-custodial interrogations. See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that a defendant's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest). In determining whether a reasonable person would consider themselves in custody, the Tennessee Supreme Court instructs us to consider a variety of factors, including the following:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

State v. Walton, 41 S.W.3d 75, 82-83 (Tenn. 2001) (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)).

A non-custodial interrogation must be voluntary in order to be admissible. Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible. Rogers v. Richmond, 365 U.S. 534, 540 (1961). In order to make the determination, the particular circumstances of each case must be examined. Monts v. State, 400 S.W.2d 722, 733 (1966). Coercive police activity is a necessary prerequisite in order to find a confession involuntary. State v. Downey, 259 S.W.3d 723, 733 (Tenn. 2008). A confession "must not be the product of 'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" Downey, 259 S.W.3d at 733-34 (quoting State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000)).

Promises of leniency, however, do not necessarily render a confession involuntary; instead, the critical question is whether law enforcement's actions were of a nature to overbear a defendant's will to resist. State v. Smith, 933 S.W.2d 450, 456 (Tenn. 1996). The court must determine "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Hunter v. Swenson, 372 F. Supp. 287 (W.D. Mo. 1974)). Factors in determining voluntariness include the age of a defendant; their level of intelligence and education; their prior experience with law enforcement; repeated and prolonged nature of the questioning; the length of the detention prior to obtaining the statement; the lack of any advice to a defendant of their constitutional rights; whether there was an unnecessary delay in bringing them before a magistrate before they gave the confession; whether they were injured, intoxicated, drugged, or in ill health; whether they were deprived of food, sleep, or medical attention; whether they were physically abused; and whether they were threatened with abuse. State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013).

-12-

Conversely, prior to any custodial interrogation, law enforcement officers are required to warn a defendant that they have the right to remain silent; that anything they say can be used against them in a court of law; that they have the right to the presence of an attorney; and that, if they cannot afford an attorney, one will be appointed for them prior to any questioning if they so desire. See Miranda, 384 U.S. at 479. A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Id. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to affect a waiver, a defendant must be adequately apprised of their right to remain silent and the consequence of deciding to abandon the right. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). The State bears the burden of proving by a preponderance of the evidence that a defendant waived their Miranda rights. Climer, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)). Certain factors apply in the determination of whether a waiver of Miranda rights qualifies as voluntary, knowing, and intelligent: the age and background of a defendant; their education and intelligence level; their reading and writing skills; their demeanor and responsiveness to questions; their prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the Miranda rights were explained. State v. Echols, 382 S.W.3d 266, 280-81 (Tenn. 2012) (citing State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000); State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998)).

### III. *Waiver*

Initially, we address the doctrine of waiver. The Defendant argues that the State has waived the issue of whether the Defendant was in custody by failing to argue it in the trial court. The record evinces that the Defendant sought to suppress the second statement taken by Sergeant Murray in the KPD interview room. There is no indication from the record that the Defendant implicated himself in the rape while he spoke with Sergeant Murray on the scene.

The issue of custody was ostensibly raised in the Defendant's motion to suppress, wherein he argued, "The statements were obtained after the commencement of formal proceedings and the statements were taken in violation of the [D]efendant's right to counsel." The State filed a response to the Defendant's motion, which did not include any argument that the Defendant was not in custody at the time he made his statement. At the motion to suppress hearing, defense counsel, during opening argument, requested that the trial court "suppress any statement that [the Defendant] gave the police at the time that he was taken into custody[.]" Defense counsel noted during closing argument that, for Miranda to apply, the Defendant had to be in custody. Regarding the issue of custody, defense counsel averred,

I think from the testimony it's obvious that he was in custody. He was taken to the police station by a detective in a police car to an interview room where he was given his Miranda warnings and interviewed for nearly three hours. I don't think custody is an issue.

[Sergeant] Murray testified here and at the preliminary hearing, "Yeah, he was free to go, but he was going to leave his clothes." When I asked [Sergeant] Murray here, "Would you have let him go? He said, "Probably not." So I think if "probably not" is his answer, he was probably in custody. So I don't think custody's an issue, so Miranda applies.

The State failed to address the issue of custody in its closing argument. The trial court did not address the custodial nature of the interrogation in either its oral or written ruling. It is clear from the record that the pivotal issue at the suppression hearing was whether, under the totality of the circumstances, the Defendant knowingly and voluntarily waived his Miranda rights.

While there may be some overlap in the factors to be considered by a trial court in deciding (1) whether a defendant was in custody; (2) whether a non-custodial confession was voluntary; or (3) whether a defendant in custody knowingly waived their Miranda rights before making a statement, these determinations are not the same although they are often intertwined. See State v. Susan Jo Walls, No. M2014-01972-CCA-R3-CD, 2016 WL 1409836, at *18 (Tenn. Crim. App. Apr. 7, 2016) (citing State v. Phillips, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (first, concluding that the defendant was not in custody for purposes of Miranda, and then, proceeding to examine the voluntariness of the non-custodial confession)), rev'd on other grounds, State v. Walls, 537 S.W.3d 892, 894 (Tenn. 2017). The Defendant correctly notes that it is well-settled law that an appellant cannot raise an issue for the first time on appeal nor can they change their arguments on appeal. See Lawrence v. Stanford, 655 S.W.2d 927, 929 (Tenn. 1983) (stating that it "has long been the general rule that questions not raised in the trial court will not be entertained on appeal"); State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. 1988) ("It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this [c]ourt.").

The State and the Defendant disagree about this court's holding in Walls regarding the waiver doctrine. The State is correct that the defendant's Miranda challenge in Walls was waived due to the defendant's failure to include it her motion for new trial. 2016 WL 1409836, at *16. However, this court went on to address whether the defendant's Miranda issue entitled her to relief under the plain error doctrine. Id. at *16-18. In so doing, this court noted that the "pivotal question" before the trial court in that case was "whether there [was] a formal arrest or, at least, the restraint of freedom of movement to

-14-

be the functional equivalent thereof." Id. at *18. The trial court reviewed the relevant factors and concluded that the defendant was not "in custody" when she confessed. Id. However, on appeal, the defendant did not make any argument that she was "in custody" as contemplated by Miranda, but she instead argued that her confession was not voluntarily given. Id. This court concluded that the defendant had, "for all intents and purposes, changed theories on appeal[,]" stating that "[t]his court may consider only the arguments presented to the trial court as to why the statement should have been suppressed." Id. For this reason, and because "there [was] no evidence in the record that the [d]efendant was intimidated, coerced, threatened, or otherwise induced into making the statement," plain error relief was not warranted. Id.

The State argues that waiver is inapplicable to its argument that the Defendant was not in custody because it "was a threshold issue that had to be proven in order to show he did not voluntarily waive his Miranda rights." The State also submits that, in Walls, this court "previously examined whether a defendant was in custody when the record did not reflect the State challenged custody in the trial court." We disagree with the State on both counts. As outlined above, this court did not make any determination regarding the custodial nature of the interrogation in Walls. This court did very briefly address the voluntariness of the confession in conducting plain error review. The State also cites to State v. Self, in support of its argument, noting that the court in that case examined whether the defendant was in custody despite the fact that "the trial court did not make an explicit finding about whether the [d]efendant was in custody." No. E2014-02466-CCA-R3-CD, 2016 WL 4542412, at *32-33. However, it is not clear from that opinion what issues surrounding the statement were raised in the trial court, and the doctrine of waiver was not addressed.

In contrast, this court held that "the State has a duty to notify the defendant that it opposes his motion on standing grounds, a result which reflects the traditional policies of notice and fair play." State v. White, 635S.W.2d 396, 399 (Tenn. Crim. App. 1982). The White court determined, "If the State fails to raise the standing issue, but instead opposes the motion on the merits, the defendant is entitled to infer that the State concedes his standing and need not offer any evidence relevant to his expectation of privacy." Id. at 400. We hold that the rationales of Walls and White apply here. The State is not entitled to any deferential treatment, especially as the Fifth Amendment constitutional protections in Miranda were formulated to protect a defendant, not the government. Accordingly, any issue surrounding the custodial nature of the interview has been waived by the State for failing to raise it in the trial court. We will conduct our analysis by assuming that the Defendant was in custody at the time he gave the statement at issue.

IV. *Intellectual Disability*

When a defendant's competency to waive the rights provided by Miranda is challenged, the determinative issue is "whether the defendant had the capacity in the first place to form a will of his own and to reject the will of others." State v. Thacker, 164 S.W.3d 208, 249 (Tenn. 2005) (quoting State v. Benton, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988)). "[T]he totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived.'" Blackstock, 19 S.W.3d at 208 (quoting Stephenson, 878 S.W.2d at 545; Moran v. Burbine, 475 U.S. 412, 421 (1986)). Discussing the capacity of intellectually disabled suspects to knowingly and intelligently waive their rights after being provided Miranda warnings, our supreme court has observed that "[m]entally retarded individuals present additional challenges for the courts because they may be less likely to understand the implications of a waiver." Id. (citing United States v. Murgas, 967 F. Supp. 695, 706 (N.D.N.Y. 1997)). The court explained,

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving . . . the constitutional rights embraced in the Miranda rubric."

Id. (quoting Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)) (alteration in Blackstock).

At the outset, we find it necessary to address the burden of proof because both parties stated at the evidentiary hearing that the Defendant had the burden. However, we reiterate that it is the State that bears the burden of proving by a preponderance of the evidence that a defendant waived their Miranda rights when the issue has been raised. Climer, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting Berghuis, 560 U.S. at 384). Stated another way, the State bears the burden of demonstrating, via the totality of the circumstances, that a defendant "had a meaningful awareness of his Miranda rights, as well as the consequences of waiving his rights." Blackstock, 19 S.W.3d at 209 (citing Stephenson, 878 S.W.2d at 544-45).

The Defendant was twenty-six years old at the time of the statement. He suffered from an intellectual disability; however, the Defendant was "a legally competent adult" and did not have a "conservator acting on his behalf." No proof suggested that the defendant had any prior experience with the criminal justice system. We also note that there appeared to be some information about the Defendant's educational history that was contained in a sealed record and considered by the trial court in its ruling. The trial court

noted in its written order that, previously, the Defendant "ha[d] been found to have intellectual disability. His Wechster intelligence scores [were] in the sealed record from his school. The [D]efendant's psychological intelligence scores [were] 53 on the WISC III in 1995 and 48 in 1998." Additionally, the State argued in its response to the Defendant's suppression motion that "the [D]efendant completed High School in Gate City, Virginia and obtained a special education diploma." The sealed record is not a part of the record on appeal. It is an appellant's responsibility to prepare an adequate record for this court to address the issues. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993).

After indictment, the trial court ordered the Defendant to undergo a competency evaluation, and the evaluators initially determined that the Defendant was not competent to stand trial because he lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." It was determined that the Defendant was competent to stand trial after he received competency training.

In its ruling at the suppression hearing, the trial court, granting the Defendant's motion to suppress, stated that it had heard testimony from Sergeant Murray and Detective Horne "regarding the circumstances" of the Defendant's statement at the KPD. The trial court noted that Sergeant Murray testified that the Defendant "seemed to be calm" at first, "and then at some point[,] he became emotional and was crying[,]" and that the Defendant appeared to understand his Miranda rights. The trial court remarked that Detective Horne testified that the Defendant "was crying and very apologetic and . . . upset" but that "he seemed to understand . . . what he was . . . doing." The trial court further noted that the Defendant had misspelled his name on the statement.

The trial court cited Blackstock and commented that the Defendant "had been diagnosed as being mentally retarded." Thereafter, the trial court mentioned that the Greene Valley report—completed six months after the Defendant gave his confession—said that the Defendant did not understand the difference between a felony and a misdemeanor and that he "did not have understanding of his rights." The court found the Greene Valley report "to be very pertinent under all the circumstances." Utilizing the "'totality of the circumstances' case," the trial court determined that the Defendant's statement was suppressed.

In a subsequent written order, the trial court referenced a separate section of the Greene Valley report—detailing the competency training—where the Defendant reported that, in stressful situations, he tends to shut down and become quiet. The trial court continued, remarking that the Defendant told examiners that he felt scared and intimidated on the day of his arrest, that "he did not know he could request an attorney and felt he had to talk[,]" that he said he wanted to go home, and that he claimed that he was told he could go after he admitted to the crime. The trial court also noted that the

-17-

interview was not recorded. However, the court observed that Sergeant Murray testified that he explained the Miranda rights to the Defendant, and the Defendant indicated he understood those rights and signed the waiver form.

The State argues that the trial court simply summarized the evidence and did not accredit the Defendant's statements in the report. However, in providing the details from Greene Valley report, the trial court remarked that the report described the Defendant's "characterization of the police interview which led to the confession." The trial court only referenced the relevant portions of the Greene Valley Report after giving a factual background and outlining the law pertaining to Miranda waivers. Furthermore, the trial court placed Sergeant Murray's testimony in parentheses. We disagree with the State that the trial court did not accredit the report or the Defendant's statements therein, albeit the trial court's implicitly doing so.

The trial court concluded its order by citing Blackstock for the proposition that "mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances." The court then held that, under the "totality of the circumstances [] concerning Miranda waivers," the Defendant's motion was granted and his confession was suppressed.

We conclude that, although the trial court was not explicit, it did consider several of the Blackstock factors in making its determination that the Defendant failed to knowingly and voluntarily waived his Miranda rights. The trial court considered more than just the Defendant's intellectual disability, including the testimony "regarding the circumstances" of the Defendant's statement at the KPD; the Defendant's emotional state during the interview; the statements that the Defendant made to the evaluators; the evaluators' conclusions in the report; and the fact that the Defendant misspelled his name on the admonition form.

In addition, the trial court mentioned in its ruling that the interview was not recorded. We agree with the Defendant that "the State's decision not to record the interview has prevented the trial court and this [c]ourt from reviewing the proceedings objectively and conducting a meaningful evaluation of the following factors—level of functioning, demeanor, responsiveness to questioning, and the manner, detail, and language in which the Miranda rights are explained." We are not holding that a recording is required. However, when the State has the burden of proof to establish that the Miranda waiver was knowingly and voluntarily made, the seemingly purposeful lack of a recording in a case such as this, which includes a level of intellectual disability, could be particularly detrimental to the State's case. Here, the trial court appropriately considered the lack of any recording in its analysis. Accordingly, we hold that, because the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be

-18-

drawn from the evidence"; and because the burden is on the State, via the totality of the circumstances, that the Defendant "had a meaningful awareness of his <u>Miranda</u> rights, as well as the consequences of waiving his rights'"; we cannot say that the trial court erred when it held that that Defendant did not knowingly and voluntarily waive his <u>Miranda</u> rights.  <u>See</u> <u>Climer</u>, 400 S.W.3d at 566 (concluding that, under the totality of the circumstances, "the State failed to prove by a preponderance of the evidence that [d]efendant in fact understood his right to appointed counsel, thus precluding a finding that [d]efendant implicitly waived his <u>Miranda</u> rights." (citing <u>Commonwealth v. Hoyt</u>, 958 N.E.2d 834, 844-45 (Mass. 2011) (holding that the State could not meet its burden of proving a valid waiver of <u>Miranda</u> rights because the defendant did not understand his right to appointed counsel))).

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE